1  Levitt Law, APC
   Scott L. Levitt, Esq.; SBN 225036
2  311 Main St. #8
   Seal Beach, CA  90740
3  P: 562.493.7548
   F: 562.493.7562
4
   Attorney for Plaintiff:
5  **Our Clean Waters**

6

7
                   **UNITED STATES DISTRICT COURT**
8
                   **CENTRAL DISTRICT OF CALIFORNIA**
9

10

11 | OUR CLEAN WATERS, a California non-profit corporation | Case No. |
    |---|---|
12 | Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES IN AN AMOUNT NOT LESS THAN $1,000,000.00** |
13 | vs. | |
14 | VALMONT INDUSTRIES, INC, a Delaware corporation d/b/a Calwest ; DOES 1 through 10, inclusive, | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
15 | | |
16 | Defendants. | |

17

18      Plaintiff OUR CLEAN WATERS ("Plaintiff" or "OCW") a non-profit public benefit

19 corporation, by and through its counsel, and hereby alleges along with its members and the

20 general public:

21              **I.      JURISDICTION AND VENUE**

22      1.   This is a civil suit brought under the citizen suit enforcement provisions of the

23 Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. ("Clean Water Act" or

24 "CWA").  This Court has subject matter jurisdiction over the parties and the subject matter of

25 this action pursuant to Section 505 1(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A), and

26 28 U.S.C. §1331 (an action arising under the laws of the United States).  The relief requested

27 is authorized pursuant to 28 U.S.C. §§ 2201-2 (power to issue declaratory relief); 33 U.S.C.

28 §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a)(civil penalties).

2. On August 10, 2017, Plaintiff provided notice of Calwest's ("Defendant" or "Calwest") violations of the CWA, and of its intention to file suit against Defendant, to all necessary recipients pursuant to 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the notice letter is attached as Exhibit A, and is incorporated.

3. More than sixty days have passed since notice was served on Defendant and all other necessary recipients. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA or the State of California has commenced or is diligently prosecution a court action to redress the violations alleged in the Complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of violations are located within this judicial district.

## II. INTRODUCTION

5. This Complaint seeks relief for discharges of storm water pollutants at Calwest's facility located at 2226 E. Dominguez Street, Long Beach, CA, 90810 ("Facility") in violation of the CWA and the National Pollutant Discharge Elimination System ("NPDES") Order No. CAS000001, State Water Resources Control Board Water Quality Orders No. 2014-0057-DWQ ("Industrial General Permit") and 92-12-DWQ (as amended by Order No. 97-03-DWQ ("Previous Industrial General Permit").

6. Rainfall events cause millions of gallons of polluted water originating from industrial operations to enter storm drains and local waterways. Water quality experts agree that storm water pollution is the cause of most of the pollution entering surface waters each year.

7. Los Angeles' waterways are natural habitats for countless amounts of fish, bird, and invertebrate species. The waterways are a place for the community recreate and commune with nature. The Defendant's continual discharge of contaminated storm water frustrates the aims of the CWA.

8. Industrial facilities that are discharging water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic wildlife. In order to protect the ecosystem, such contaminated discharges must be controlled.

### III. THE PARTIES

9. Plaintiff, OCW is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 9465 Wilshire Blvd, #300, Beverly Hills, CA, 90212. The members of OCW are devoted to keeping the waters free from contamination to enjoy and preserve the wildlife within.

10. OCW's mission is simply to keep the waters of Southern California as clean as possible. In doing so, OCW researches public information related to pollutants discharged by those organizations holding permits for such discharge in the Southern California area, and contacting any such organizations whose pollutants exceed the allowable levels.

11. OCW's members, and the general public, as it represents all citizens in the local area who want to enjoy pollution free waters with protection of the mammals and animals of such waters.

12. The unlawful discharge of pollutants from the Facility into the Dominguez Channel Estuary, the Pacific Ocean, and the overall Affected Watershed (the "Receiving Waters") impairs the ability of OCW members to use and enjoy these waters. Thus, the interests of OCW's members have been, and will continue to be adversely affected by the Facility's failure to comply with the CWA and General Industrial Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant(s)' activities.

13. The continuing commission of the acts and omissions alleged herein will irreparable harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

14. Plaintiff alleges on information and belief that Defendant Valmont Industries is a Delaware corporation d/b/a Calwest that operates, and possibly owns the Facility.

15. Upon information and belief, and upon that basis, Plaintiff alleges that the true

names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to Plaintiff. Plaintiff will amend this complaint to show their true names and capacities when the names have been ascertained.

16. Calwest and the DOES are referred to collectively throughout this complaint as Defendant or Defendants.

## IV. STATUTORY BACKGROUND

17. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into the waters of the United States, unless the discharge is in compliance with various enumerated sections of the CWA. Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

18. Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate storm water discharges through individual permits issued to specific dischargers, or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

19. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("State Board") to issue NPDES permits, including general NPDES permits, in California. 33 U.S.C. §§ 1342(b), (d). The objective of the Act is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251(a), 1311(b)(2)(A). Therefore, the act prohibits the discharge of a pollutant from any point source into waters of the United States except in compliance with other requirements of the Act, including Section 402, which provides for NPDES permits. 33 U.S.C. §§ 1311(a), 1342(p). The State Board and Regional Board (Region 4) are responsible for issuance and enforcement of the General Permit, which covers the Facility and the Receiving Waters.

20. The State Board elected to issue a statewide General Permit for industrial storm water discharges. Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ ("1997 Permit"). On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the General Permit was reissued (the "2015 Permit").

21. In order to discharge storm waters lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C.§1311(a).

22. The General Permit strictly prohibits certain kinds of discharges. Effluent Limitation Section B(3) of the 1997 Permit and V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include both nonstructural and structural measures. Receiving Water Limitation C(1) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment. The 2015 Permit includes the same Receiving Water Limitation. *See* 2015 Permit, §VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Permit's Receiving Water Limitations. *See* 1997 Permit, §C(1); 2015 Permit, §VI.B. Receiving Water Limitation C(2) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS"). The 2015 Permit includes the same receiving water limitation. *See* 2015 Permit, §VI.A. Discharges that contain pollutants in excess of an applicable WQS violate these Receiving Water Limitations. *See* 1997 Permit, § C(2); *see also* 2015 Permit, § VI.A.

23. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Both the 1997 Permit and the 2015 Permit generally require facility operators to: (1) submit a Notice of Intent

("NOI") describing the type of activity or activities undertaken at a facility and committing the operator to comply with the terms and conditions of the Permit; (2) eliminate unauthorized non-storm water discharges; (3) develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"); (4) perform monitoring of storm water discharges and unauthorized non-storm water discharges; and (5) file an Annual Report summarizing the year's industrial activities and certifying compliance with the General Permit.

24. The SWPPP must describe storm water control facilities and measures that comply with the BAT and the BCT standards. The General Permit requires the initial SWPPP to have been developed and implemented before October 1, 1992. The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *See* 1997 Permit, §A(2). Among other requirements, the SWPPP must include the following: identification and training of a pollution prevention team; a site map with detailed demarcations of potential pollutant sources; and a description of BMPs. Such must include both structural, and non-structural techniques. Section X(D)-X(I) of the 2015 Permit sets forth essentially the same SWPPP requirements, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as advanced BMPs as necessary to achieve BAT/BCT. *See* 2015 Permit, § X(H). The 2015 Permit further requires certain SWPPP enhancements, including a comprehensive assessment of potential pollutant sources and more specific BMP descriptions. *See* 2015 Permit, §§ X(G)(2), (4),(5).

25. The objectives of the requirement to develop, maintain and revise a SWPPP are to identify pollutant sources and develop BMPs that reduce or prevent polluted storm water from negatively affecting Receiving Waters and California communities. *See* 1997 Permit, § A(2); 2015 Permit, § X(C). BMPs must achieve compliance with the Permit's Effluent Limitations and Receiving Water Limitations. To ensure compliance, the SWPPP must be evalu-

ated and revised as necessary. *See* 1997 Permit, §§ A(9)-(10); 2015 Permit, §X(B). Failure to develop or implement an adequate SWPPP, or revise an existing SWPPP as necessary, is an independent Permit Violation. *See* 2015 Permit, Fact Sheet § I(1).

26. Also, the 1997 Permit requires facility operators to develop and implement an adequate Monitoring and Reporting Program ("M&RP") before industrial activities begin at the facility. *See* 1997 Permit, § B(1). The 2015 Permit contains substantially identical requirements. *See* 2015 Permit, § XI. The primary objective of the M&RP is to detect and measure the concentration of pollutants in a facility's discharges to ensure compliance with the Permit's Effluent Limitations and Receiving Water Limitations. An adequate M&RP must be reviewed and revised in response to analyses and observations to ensure that BMP's are effectively reducing and/or eliminating pollutants from a facility's activities from entering the Receiving Waters. The Permit includes specific provisions requiring all covered facilities to revise and improve BMPs when analytical results demonstrate an exceedance of a NAL. *See 2015* Permit, § XII.

27. The 1997 Permit and 2015 Permit both contain the basic requirements, which include conducting visual observations of storm water discharges and authorized non-storm water discharges, collect and analyze samples of storm water discharges for relevant pollutants, revise and change the SWPP and/or facility operations as necessary in response to analytical data, and file an Annual Report with the State Board. *See e.g.* 1997 Permit, §§ (B)3-(B)16.

28. The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of a wet season, and at least one other storm event during a reporting year. *See* 1997 Permit, § B(5). The 2015 Permit created a more demanding schedule, and requires Calwest to sample and analyze, no less than, four storm water discharges over the course of a reporting year. *See* 2015 Permit, § XI(B)(2). Under the 1997 Permit, facilities must sample from qualifying storm events, which occur when there is a discharge of storm water during facility operating hours that was proceeded by at least three working days without a storm water discharge. *See* 1997 Permit, § B(5)(b). The 2015 Permit

Broadens the definition of qualifying storm event by requiring only 48 hours without a storm water discharge from any drainage area. *See* Permit, § XI(B)(1)(b).  A sample must be collected from each discharge point at the Facility, and if the operator fails to collect from each discharge point, the operator must still collect samples from two other storm events and explain in the Annual Report why the first storm event was not sampled.

29. The General Permit requires all facilities to sample and analyze storm water discharges for the following parameters: pH, Total Suspended Solids ("TSS"), Specific Conductance ("SC"), and Total Organic Carbon ("TOC") or Oil and Grease ("O&G"). *See* 1997 Permit, § B(5)(c)(i); 2015 Permit, §§ XI(B)(6)(a)-(b).  The Permit further requires dischargers to sample for parameters based on a facility's standard industrial classification ("SIC") code. *Id.* at Table D and Table 1 respectively.  The Permit also requires the Facility to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities or that are associated with industrial activities at the site. *See* 1997 Permit, § B(5)(c)(ii); 2015 Permit, § XI(B)(6)(c).

30. The Beneficial Uses of the Receiving Waters within the Affected Watershed where the Facility is located include navigation; commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species; migration of aquatic organisms; spawning, reproduction, and/or early development; and water contact and non-contact recreation.

31. Surface waters that cannot support the beneficial uses listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the CWA.  According to the State Board's 2012 California Integrated Report on 303(d) impaired water bodies, the Affected Watershed is impaired by, among other pollutants, ammonia, chrysene, bacteria, copper, lead, zinc, sediment toxicity, and PCBs.

32. Polluted discharges from the Facility cause and/or contribute to the degradation of the waters that OCW has made its mission to protect.  Discharges of pollutants at levels above WQS contribute to the impairment of the beneficial uses of the waters receiving the discharges and constitute violations of the Permit and CWA.  Such pollution will undoubted-

ly have a negative effect beyond when it reaches other segments of Los Angeles's vulnerable coast.

33. The EPA published "benchmark" levels as numeric thresholds to aid in determining whether a facility discharging industrial storm water had implemented the requisite BAT and/or BCT as mandated by the CWA. *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009. EPA's benchmarks serve as objective measures for evaluating whether a permittee's BMP's achieve BAT/BCT standards as required by Effluent Limitation B(3) of the 1997 Permit. Under the 2015 Permit, the State Board added Numeric Action Levels ("NALs") as part of the adaptive management approach implemented through the Permit. *See* 2015 Permit, § V(A). NALs are derived from EPA benchmarks, and function to trigger reporting requirements. *See* 2015 Permit, Fact Sheet § I(D)(5). While exceedances of the NALs demonstrate that a facility is among the worst performing facilities in the State, and has failed to implement pollution prevention measures required by the Permit and the CWA, NALs do not represent technology based criteria relevant to determining whether a permittee has implemented BMPs that achieve BAT/BCT. Benchmarks and NALs represent pollutant concentrations at which a storm water discharge could impair, or contribute to impairing, water quality and or affect human health.

34. Sections 505(a)(1) and 505(f) of the CWA provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Each separate violation of the CWA subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4.

## V. STATEMENT OF FACTS

35.     Upon information and belief, CALWEST' Facility was enrolled in the storm water permit program under the 1997 Permit since May 7, 1999. The Facility submitted NOIs to the State Board for coverage under the 2015 Permit on June 29, 2015. The Waste Discharge Identification ("WDID") numbers for the Facility is 419I015094.

36.     The Facility is approximately 10 acres, almost entirely composed of impervious surfaces. The SIC code for the Facility is 3479, designated for galvanizing. Upon information and belief, Calwest engages in hot dip galvanizing; pickling; water rinsing; sandblasting; welding; wastewater treatment; acid spraying; and loading and unloading. At a minimum, Calwest utilizes the following industrial materials at the Facility: zinc; steel grit; steel shot; bismuth; aluminum; blast media; zinc ammonium chloride; ammonium chloride; ammonium hydroxide; zinc phosphate; caustic soda; hydrochloric acid; phosphoric acid; lime; motor and machine oils. Possible pollutants from the Facility include: pH, Total Suspended Solids ("TSS"), Oil and Grease ("O&G"), Zinc (Zn), Nitrate + Nitrite Nitrogen (N+N), additional metals, and other pollutants. Storm water from the Facility discharges, via the local storm sewer system and/or surface runoff indirectly into the Dominguez Channel Estuary.

37.     According to information and belief, activities at the Facility that are significant to storm water management include the usage of substances that are and or contain hazardous materials include diesel fuel, gasoline, lubricants, transmission fluid, antifreeze, used oil, paint, and related materials, organic cleaners and solvents. The storm water pollution originating from the Facility has been exacerbated by the unchecked spread of pH, Zinc (Zn), Nitrate + Nitrite (N+N), and other pollutants.

38.     Storm water from the Facility discharges, via the local storm sewer system and/or surface runoff indirectly into the Dominguez Channel Estuary, the Pacific Ocean, and the Affected Watershed.

39.     On information and belief, Plaintiff alleges that the Facility's management practices do not prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

40.     Since at least November 1, 2012, Calwest has taken samples or arranged for

samples to be taken of storm water discharges at the Facility. The sample reports were reported in the Facility's annual reports submitted to the Regional Board.

41. According to information available to OCW, including a review of both electronic and hard copy files held by the Regional Board, the Facility has been in continuous violation of the Permit's Effluent Limitations for the entirety of the relevant statute of limitations, particularly in relation to pH, Zn, and N+N levels.

42. The data available to OCW relevant to the Facility's violations of the Permit's Effluent Limitation, as reported by the Regional Board by Calwest, are attached hereto. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988). A true and correct copy of the latest data reported to the Regional Board is attached as Exhibit B, and is incorporated. These results of storm water sample analysis demonstrate that Calwest has not developed or implemented BMPs that achieve compliance with the CWA's BAT/BCT mandates, despite OCW's NOI, and repeated assurances from Calwest's counsel that Calwest was in compliance.

43. The data indicates that discharges from the Facility contain concentrations of pollutants that cause or contribute to a violation of (1) California's Water Quality Control Plan; (2) the EPA's California Toxic Rule ("CTR"), *See* 40 C.F.R. § 131.38; and (3) the CWA. The Basin Plan has a narrative standard, including that inland surface waters "shall not contain suspended or settleable materials in concentrations that cause nuisance or adversely affect beneficial uses." Basin Plan, 3-37. The Basin Plan also includes a toxicity standard requiring inland surface waters "be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan, 3-38. The CTR includes numeric criteria set to protect human health and the environment in the State of California. (See U.S. EPA, Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Fact Sheet, EPA 823-00-008 (Apr. 2000)). Discharges with pollutant levels in excess of the CTR Criteria, the Basin Plan Standards, and/or other applicable WQS are viola-

tions of the Permit's Receiving Water Limitations.

44. WQS applicable to the Facility include, but may not be limited to the following: pH, Basin Plan; 6.5-8.5 s.u.; Zn, CTR, 0.120 mg/L CMC. Discharges from the Facility in excess of the numeric water quality standards set in these WQS's constitute individual violations of Receiving Water Limitations.

45. Discharges of elevated concentrations of pollutants in the Facility's storm water can adversely impact human health. The Facility discharges storm water that contains chemicals, including Zinc, which can be acutely toxic and/or have sub-lethal impacts on humans, wildlife and can adversely affect overall ecosystem health.

46. On information and belief, Plaintiff further alleges that Calwest has failed to collect samples from an adequate number of storm events that have occurred in the last three storm water years (2014-16).

47. The Facility's operator must report any noncompliance with the Permit at the time that Annual Reports are submitted, including (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence, § C(11)(d). Calwest has failed and continues to report noncompliance as required.

48. OCW will include additional violations when information becomes available, including specifically violations of the 2015 Permit reporting requirements. *See* 2015 Permit, §§ XII, XVI.

49. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of Permit Effluent Limitations of the CWA**

50. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully set forth herein.

51. Effluent Limitation Sections B(3) of the 1997 Permit and V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has not reduced or prevented discharges of pH, Zinc (Zn), Nitrate + Nitrite (N+N), and other pollutants associated with industrial activities at the Facility through implementation of BMPs that achieve BAT and BCT in violation of Effluent Limitation Sections B(3) of the 1997 Permit and V(A) of the 2015 Permit.

52. It is a violation of the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

53. Each and every violation of the Storm Water Permit Effluent Limitations in a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

54. The violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

55. By committing the acts and omissions alleged above, the Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 1, 2012 to present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

56. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm OCW has no plain, speedy, or adequate remedy at law.

57. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Receiving Water Limitations and the Act

58. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

59. Receiving Water Limitation C(1) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment. The 2015 Permit includes the same Receiving Water Limitation. *See* 2015 Permit, § VI.B. Discharges that contain pollutants in concentrations exceeding levels known to adversely impact aquatic species and the environment constitute violations of these Receiving Water Limitations. *Id*. at § VI.A.

60. Plaintiff is informed and believes, and thereupon alleges, that since at least November 1, 2012, Defendant has discharged polluted storm water from the Facility causing or contributing to the violation of California's Water Quality Control Plan and/or the Basin Plan, and that adversely impacts human health or the environment in violation of the Permit's Receiving Water Limitation.

61. It is a violation of the Storm Water Permit Effluent Limitations and each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility. Each violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

62. By committing the acts and omissions alleged above, the Owner and/or Operator are subject to an assessment of civil Penalties for each and every violation of the Act occurring from November 1, 2012 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

63. An action for injunctive relief is authorized by the Act's section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm OCW

COMPLAINT – Citizens Suit Our Clean Waters v. CALWEST

1  has no plain, speedy, or adequate remedy at law.

2      64.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3  an actual controversy exists as to the rights and other legal relations of the Parties.

5      WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement an  
Adequate Monitoring and Reporting Program  
(Violation of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342)**

10      65.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if full set

11  forth herein.

12      66.    Defendant has not developed and implemented an adequate Monitoring and

13  Reporting Program ("M&RP") for the Facility.

14      67.    Each day since November 1, 2012 that the Facility did not develop of imple-

15  ment an adequate M&RP for the Facility in violation of the General Permit is a separate and

16  distinct violation to the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

17  The absence of requisite monitoring and analytical results are ongoing and continuous.

18      68.    By committing the acts and omissions alleged above, the Owner and/or Opera-

19  tor is subject to an assessment of civil penalties for each and every violation of the CWA oc-

20  curring from November 1, 2012 to the present, pursuant to sections 309(d) and 505 of the

21  CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

22      69.    An action for injunctive relief is authorized by Section 505(a) of the CWA, 33

23  U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

24  irreparably harm Plaintiff and the citizens of the State of California, for which harm OCW

25  has no plain, speedy, or adequate remedy at law.

26      70.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

27  an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update
### An Adequate Storm Water Pollution Prevention Plan (SWPPP)
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

71.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if full set forth herein.

72.  Defendant has not developed and implemented an adequate SWPPP for the Facility.

73.  Each day since at least November 1, 2012, that Defendant has not developed, implemented, and updated an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

74.  By committing the act and omissions alleged above, the Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 1, 2012 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4

75.  An action for injunctive relief is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm OCW has no plain, speedy, or adequate remedy at law.

76.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1. Declare Defendant(s) to have violated and to be in violation of the CWA as alleged herein;

2. Enjoin Defendant(s) from discharging polluted storm water from the Facility unless authorized by the Permit;

3. Enjoin Defendant(s) from further violating the substantive and procedural requirements of the Permit;

4. Order Defendant(s) to immediately implement storm water pollution control and treatment technologies, and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

5. Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

6. Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

7. Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the CWA and the Court's orders;

8. Order Defendant(s) to pay civil penalties of $37,500 per day per violation for all violations pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4 before November 2, 2015; The CWA

imposes civil penalty liability of up to $51,570 per day of violation occurring after November 2, 2015;

9. Order Defendant(s) to make appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

10. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and,

11. Award any such other and further relief, as the Court may deem appropriate.

                                                    Respectfully submitted,

                                                    **LEVITT LAW, APC**

Date: January 1, 2018

                                          By: *Scott L. Levitt*
                                                 Scott L. Levitt
                                                 Attorneys for Plaintiff